13-4-2-8 State of Michigan Sault Ste. Marie Tribe We are walking in Washington County 15 minutes per side 31-40-0 Sault Ste. Marie Tribe Edward Dumont  Tribe used funds from the Michigan Indian Land Claims Settlement Act to acquire some land in Lansing, Michigan. Now the tribe believes that under that act, under the terms of that act, that land must be held in trust for the tribe by the Federal Secretary of the Interior. He wants to test that claim by making a submission to the secretary and asking her for agency action. But the district court has enjoined the tribe from making that federal administrative submission so that parties can litigate, while the parties litigate, the claim that the state has raised here, which is that the tribe's milks of filing would violate the terms of a Class III gaming compact between the tribe and the state of Michigan. Now that injunction can be vacated, should be vacated, for lack of jurisdiction, for lack of likelihood of success on the merits, because the balance of harms sharply favors the tribe, or at a minimum, because it's overbroad. But in my time this morning, I'd like to focus on a couple of overarching points. One of them is that the entire legal framework here relates to Class III, or full casino-style gaming. And that's relevant both to jurisdiction and to the tribe. When you say jurisdiction, that's the statute that lifts the immunity of the tribe? It's all the same thing? Right. That's the Indian Gaming Regulatory Act, which has a provision, which the state and the district court have relied on here, that abrogates tribal immunity in a limited circumstance. So everybody agrees in order to affirm, you have to find something under that provision? You have to find a basis for jurisdiction under that provision? I believe that's correct. You can ask the state, but we certainly think that's right. The only abrogation of tribal immunity here would come from that, that's been suggested, would come from that provision. And then I'd also like to spend some time on the balance of harms. I want to hear about the balance of harms in this. I think that's certainly a critical issue that one has to consider, of course, any time there's injunctive relief, but I think it's particularly significant here. Because I think the record shows that while there's not this Class III gaming there, there's no sharing agreement, that's the record right now. So you go ahead and proceed through your argument, but I do want to hear about that. I'd be happy to turn to that. Maybe I can just start with jurisdiction since that would be the normal way. And Class II and Class III gaming, I think it's very important to focus here, also when we get to the balance of harms, on the fact that both the jurisdictional provision and the compact the state is acting under relate only to Class III gaming, which is full casino-style gaming. Now, that's relevant to jurisdiction because the IGRA provision that we're talking about authorizes suits, quote, to enjoin a Class III gaming activity, whereas what the district court actually has enjoined here is a federal administrative submission under the Michigan Indian Land Claims Settlement Act, which has nothing to do with gaming. So would you be satisfied if the injunction said you may go forward to submit the property, but you are permanently barred from Tier III gaming? Well, permanently barred wouldn't be an appropriate preliminary injunction, but we do think that's the only injunction that could be entered as permanent relief, and we think correspondingly the only appropriate preliminary injunction, if there could be one, would be one that would say you may not game. While we're litigating this dispute, you may not conduct any Class III gaming on that land. That's the only injunction that's offered. Is it not your position that the intent is to engage in Tier III gaming? The intent is to engage in gaming, and if we can do Class III, we will do Class III. If we can only do Class II, we'll do Class II. But that issue is far down the road. So what the state's trying to do is prevent us from even taking the first step toward establishing our right to have the land taken into trust on the premise that someday down the road we might do Class III gaming. Which you have under MILCSA or MILF or whatever that is. Under MILCSA. MILCSA. Right, and that's a federal statutory right and, frankly, an obligation of ours to tender that title to the Secretary given the way that it was acquired. And it's your position that if you then tender it and it is accepted, you automatically have the right to engage in Class III gambling. Is that correct? That is our legal position. That position, like many other issues here, will have to be tested at an appropriate time. When you say many other issues, the other issue is the Section 9 of the PACT. Right. Those are the two big issues. Those are the two big issues. Those are the two big issues that might keep you from doing Class III. That's correct. I'm going to interrupt your series of questions. Then here's my next question. It seems to me that those issues, Congress could not have intended that those issues could not be litigated at an appropriate time. And if this is not the time because the action that has been enjoined is a preliminary action that might not necessarily lead to Class III gaming, when is the appropriate time when there would be a waiver of sovereign immunity and those issues could be litigated in federal court? Does my question make sense? Yes. And the tribe has always been frank about that. We've always conceded that if we succeed in having the land taken into trust and if we establish our right to conduct Class III gaming or conduct gaming, or even if we just go ahead and start conducting gaming at that point, if it's Class III gaming, then this provision of IGRA would apply. There would be Class III gaming going on. So what would you have to do in order to make it ripe, I guess, to raise such a claim? You just have to announce? Once you get the land, you announce that you're thinking about gaming, then they could bring the suit. That's another question. Well, that's the question I'm asking. Right. No, I'm sorry. I understand that. There are a hierarchy of answers to that. Our position is that we would have to commence gaming because that's what corresponds to the terms of the statute. But I understand that, for instance, the court in Arizona, for instance, held that there's a period before that when it's a very immediate and realistic reason. Normally, in the ordinary words of bringing a suit to enjoin something includes bringing a suit to enjoin it before it happens. I mean, that oftentimes happens, right? I'm not sure that's entirely correct, and I think the specific language that we're dealing with here says that the Congress has authorized a suit to enjoin the conduct of a Class III gaming activity on Indian lands in violation of the contract. Those are all questions. Well, let me put it this way. If you're going to argue that they have to wait until the chips and cards are actually being dealt, that undermines your argument that they can't bring suit now. So if you could identify a point in between, it would strengthen your argument that you can't bring suit now. Am I making sense? Because if it just seems strange that Congress would say, yeah, you can bring suit to challenge something, but only when the chips are down, as it were. And only when the equities have shifted based on the amount of money spent by the various parties, correct? Right. Although, as a footnote to what Judge Strange just added, for a permanent injunction, it wouldn't matter about the equities, right? A permanent injunction would just be whether it's consistent with the law or not. Well, I think I'm not sure that's correct either.  Any equitable relief is kind of all equities. Well, yeah, but you don't sort of weigh the harms when somebody is against the law and you've made a final determination that it's against the law and they've got to stop. Well, and I do think that we've always said, look, there's two points about this. We've always said if we got to a point where we had gone down the road clearly proceeding at our own risk, we would be ill-positioned to claim equities at that point. But second, because of my class two, class three point,  the notion that we would get all the way to building a casino and then it would be total waste if that were enjoined is just false because what we could do with that space is class two gaming, which is not in violation of IGRA and would not be in violation of the Compact. I'm still trying to get you to identify some time earlier than when you're actually gambling on that property. You're now saying that your position is that there's no waiver of sovereign immunity until there is actual gambling going on so they can wait and hold their lawsuit papers, but they've got to wait until there's a bet placed before they can sue. Is that your position? With respect, there clearly is jurisdiction at that point. That's not my question. And there may very well be jurisdiction. And you suggest when may very well occur? The tribe's position is that that's when jurisdiction attaches. But the court in Tohono, for instance, in Arizona, held that it's before that. But there the land had been taken into trust. There was a plan to conduct class three gaming. Let me put it this way. Is there a way we can rule for you, if that's what we think the law requires at this point, and clearly preserve the ability to sue at some point prior to when the chips are down? Yes, I think you absolutely could. What would we suggest? I think you would say that at a minimum it's not ripe now. The land has to go into trust. There has to be a realistic, immediate, and relatively imminent prospect of prosecution. It's realistic and relatively immediate now, isn't it? And if we say there's not, then you'll say, well, under that opinion, you can't do it until the chips are down. Well, maybe I should turn for a moment to the balance of farms because I think it addresses... I mean, we'll give you time to talk about the balance of farms, but I don't know the answer to the jurisdictional question. I'm really not trying to be difficult here, but we think the answer is that Congress provided... There's a sovereign immunity issue here. It's a technical area where any abrogation has to be elusive under the law. We think it's clear under this statute that immunity is abrogated if and when we start Class III gaming. You're asking me if it's possible that jurisdiction attaches sooner than that. The answer to that is yes, it is possible, but it is not possible now because right now all... I disagree with you. Just assume for the moment that we just disagree with you that you have to wait until gambling starts. Why doesn't that mean that you can sue now? It could mean that. There could be jurisdiction, and I guess I'd also like to say fundamentally for the tribe, we understand that we are going to have to litigate this issue with the state at some point. Whether we litigate it now or later is not our fundamental concern here. Our fundamental concern is being barred in the meantime, while we sort that question out on the merits, from even getting started with the federal administrative process under MILCS. That's where I think the balance of harms is critical because here, what's happened here is the tribe needs to get... We have a development plan that poses a number of legal questions. We've talked about some of them. The first one is whether this land needs to be held in trust by the Secretary of the Interior because of how we acquired it. We want to get that resolved. The way to get it resolved is to submit that question to the Secretary. Finally resolving it will take time. We are working under a January of 2017 deadline. This injunction has already cost us a year, which is time we will never be able to get back. That is serious, immediate, and irreparable harm. Now, on the other side, it's hard for me to understand what harm the state actually faces from having this injunction denied for two reasons. One, the most relief they are ever entitled to, whether it's now or later, is an injunction barring Class III gaming on the Lansing property. They can get that at any time. They can get that if we go forward and litigate this now without a preliminary injunction. They can get that injunction at the end. There is no bar to the court's ability to impose it. How do you respond, though, to the state's assertion that they're going to suffer irreparable harm if you're allowed to go forward without this compact thing in place and that other tribes may be encouraged to act in derogation of the compact in the meantime and that that is a harm that they would necessarily incur absent the injunction? How do you respond to that? I don't think that the basic balance is the balance between the state and the tribe here. I think that balance is clear. The notion that other third parties might look at this litigation and choose to take other steps to change their position, I just think is highly speculative. The two tribes that have weighed in. Counselor, isn't that the very essence of the act itself? I mean, isn't that the congressional intent that you are not going to create a situation in which various tribes are going at independently and creating off-reservation gambling casinos and keeping all the revenue? Wasn't the purpose of the act to create this balance among the tribes, the state, and then create the compacts that would prevent this huge proliferation of casinos competing with one another among the various tribes? How can you get away from the congressional intent? Well, the congressional intent was certainly to strike a balance of important interests here, including the sovereign interests of the states and the sovereign interests of the tribes. The way it does that with respect to Class III gaming, which is what we're talking about here, is to provide the compact mechanism. And one important aspect of the compact mechanism is that the parties are specifically instructed by Congress in the statute that they may negotiate over enforcement terms. Now, the state didn't do that here. Well, it did. I mean, there are enforcement terms in the compact. They don't touch this situation. And to terms that are not covered by the specifics of the compact, both sides, both the state and the tribe, expressly reserve their sovereign immunity. So I just don't think it's possible to say that the balance that Congress had in mind here has been overturned. What the parties here left was the congressional default mechanism for a dispute resolution over this kind of dispute, and that is for abrogation if and when there's a ripe question about Class III gaming in violation of the compact. Why wouldn't you wait on the Supreme Court's determination of the Bay Mills case? It seems to me that what we've got here is two potential loopholes, yours and Bay Mills. And now the Supreme Court has said, we're going to look at Bay Mills. And I know that you are under a different loophole or exception, but you say, we don't qualify as Indian lands. Bay Mills says, we don't qualify as Indian lands. Sovereign immunity has not been abrogated. That's your position. That's Bay Mills' position. And now the Supreme Court has said, we're going to look at that. Why should we not let the Supreme Court opine on those two very particular issues that I think form the core of this question of congressional intent and how the Act itself works? Let them decide what that Act means, and then everyone would know how those loopholes are to be treated. Why should we jump in now? Because the core question in Bay Mills, the core statutory question in Bay Mills, is about the existence or non-existence of Indian lands. And this case is different in two important reasons. The most important is that here, unlike in Bay Mills, what the state is seeking is not, and what the district court has imposed, is not an injunction barring Class III gaming. That was the objective in Bay Mills. It's what the state is asking for in Bay Mills. It's not what the state is asking for here. And the second thing is that the temporal question is different because the conundrum in Bay Mills was that one side was saying this is Indian lands now and always will be, and the other side was saying it's not Indian lands now and never will be. We're saying it's not Indian lands now, but it will be Indian lands if we can get to the Secretary and get our federal administrative claim. But then the second step for you is, and then because of the way we make it Indian lands, we don't abrogate the Indian tribe's sovereign immunity. I guess what I'm struggling with is the practical outcome. It seems to me that you've got two different routes that really do the same thing. They undercut the balance that was created by the Indian Gaming Act. Well, I'm sorry, but I fundamentally disagree about it being the same outcome because we have never questioned that there will be a time for the state to bring this action and to get adjudication if we are conducting Class III gaming on this property, or even perhaps before we start conducting Class III gaming, but once the property is in trust. But you clearly at the outset, though, expressed the intent to do Class III gaming. I mean, that's five percenter. If it is legally possible, and just if I can say as a practical matter, although as a practical matter the tribe will want that question resolved. So I think you can be confident that the tribe will tee that question up. It's just in our view, which we would do by going either to the Interior Secretary or to the National Indian Gaming Commission and seeking an opinion that we are right about the Indian lands issue. If that opinion is rendered, then it will be challengeable in federal court by the state or others under the APA. But we view that as the second question here, not the first. The first question is whether we have anything to have a question about Section 20 or not because this land either is going to go into trust or it's not. And it's that question that is antecedent to all the others, and it's that that we're trying to get teed up for a logical, orderly decision, which the state will have every opportunity to contest, but we can't get started on that question because of the injunction entered by the district court here. And that injunction on that basis is fundamental. Thank you, counsel. We'll hear from opposing counsel. Good morning, Your Honors. My name is Blue Ryan Wasner. I'm here on behalf of both systems attorneys general for the state of Michigan representing the state in this case. I guess I'd like to point out first that the state took every step that it could to expeditiously address its concern that what the tribe was doing violated both its compact and pig grounds. We have learned that the tribe had been negotiating a comprehensive development agreement with Lansing, and it understood what was happening, that they were proposing a casino in Lansing that was well over 100 miles from the tribe's reservation. We sent a letter to the tribe warning them that we thought this was unlawful and that they shouldn't do it, and if they did, they did that their own way. And just so we understand your ultimate position, it's that it doesn't fit under the settlement lands category? We certainly will. That's one of the two main arguments. That would be one of the claims. And the other main one is that it violates the pact, and they're bound by the pact. The primary claim in this case is that it violates Section 9 of the law. But you got both of them. Well, depending on whether you agree that Council 4, I think it is, is right or not. John Chris said that it was right. We weren't sure. We included it. So you more or less conceded that it might not be right? Well, that's correct. That's exactly right. And that's the one that's based on the settlement lands issue? Yes. But either one of them would stop Class 3 gaming if you were right on one of those ultimate issues? Correct. Before you step back in, why isn't Bay met? Why don't you think the Supreme Court's decision in Bay Mills is going to be instructive for this case? For the same reasons that Mr. DeMont said. And I should point out that, as I understand the tribe's argument, they say that Bay Mills does govern in some fashion. I think they also are attempting to distinguish it as well. We are distinguishing it. We believe it doesn't apply because, as Mr. DeMont said, the issue there in Bay Mills was whether that property was ever going to be Indian land. The tribe had to argue, the Bay Mills tribe, had to argue that that land would never be taken into trust. And that's how they got under the Section 20 of IGRA exception for after-fire property if it wasn't in trust, and they said we can game on this. So they were never going to apply to have that land taken into trust. We alleged that in our complaint in the Bay Mills case, and this court said that because you alleged that in your complaint that it would never be in trust, it would never be Indian lands, you don't meet the jurisdictional requirements for the abrogation of sovereign immunity that's in 2710 of IGRA. So different here. We are not alleging that it's never going to be Indian lands. You're alleging a different report. We're alleging that it violates the contract primarily. Differently. Absolutely differently. And the issue, there's no question that the tribe, in fact, the whole, what we're objecting to is that this tribe, the Sioux tribe, is going to apply to have the land taken into trust. That's the whole purpose of what they're doing. Which is the stepstone, though, to claim that it is an exception to the prohibition on Class III gambling. Exactly. I guess I'm just struggling because it seems to me, though, you go different routes, you're ending up in the same spot. It's possible. And that the Supreme Court may well opine either on immunity or the definition of Indian lands that would impact this case. We expect them to certainly opine on immunity, whether the tribe has sovereign immunity. On the question of Indian lands, I'm not sure. Is there an issue as to whether there's immunity or just in general or as immunity under that statute? Well, the basic issue is whether there is immunity under ABRA. The application and what's being argued in the Supreme Court is going beyond that as well, as to how broad that immunity should be structured now. So it's possible that the Supreme Court will agree with us flat out that there is an abrogation there in ABRA. It's also possible. Help me with understanding how to think about this case. You're, in essence, seeking an injunction against a preliminary step to Class III gaming. Yes. And it seems to me that that's not under the literal words of the waiver of sovereign immunity that you're relying on, which say suits to stop Class III gaming. I think this is suit to stop something which is a step towards Class III gaming but could, although it probably isn't, be a step towards something else. Right? So it doesn't exactly fit within the language. Well, I can't deny that. So why wouldn't it make sense to wait until they do it, they have the right to do it, as long as they don't gamble on it from your perspective, right? But they don't, Your Honor. They don't have the right to take it at all? Absolutely. They agreed in their compact with the state. They would not apply to have land taken into trust. It violates the compact if they do. But only if it's for a certain purpose. That's the question I have for you. Since this is a preliminary step and what they're doing is submitting the application, the counsel opposite says that they have been significantly harmed by not being allowed to file the application to have the land taken into trust. And he argues that if you take this preliminary step, then there are other avenues that, you know, the other people can take should they proceed with this process. But that the harm to them by not being able to at least have the land taken into trust is really, I suppose, irreparable. And I want you to address that balance of harms argument at this particular preliminary step. Sure. First of all, the harm that they are claiming here is self-imposed harm. They did not have to go out and sign a comprehensive development agreement with the city of Lansing. They did that pretty much in secret. They were negotiating for approximately a year with the city before anyone knew about it. As soon as we learned about it, we said we shouldn't do that. They went ahead and bought this piece of property over our objection and our warning. So to a large extent, whatever harm may be occurring here, which is they're saying is, well, we have time limits in this agreement with the city, we're going to run out. What's the harm to the state, though, if, in fact, we grant relief to the other side? What's your articulated harm? Well, we have a right in our compact with this tribe. We've had that compact since 1993. Section 9, it says they agreed, they promised they will not apply to have land taken into trust for gaming purposes. They have announced in uncertain terms they're going to apply to have land taken into trust for gaming purposes. It's going to violate Section 9. Now, how are we harmed? First of all, as Mr. DeMond pointed out, there are other avenues that we will have to pursue later. We will probably have to file some sort of administrative decision or administrative appeal. We'll probably have to sue the United States in the process of doing that. We'll probably have to bring other court proceedings to deal with the fallout of them filing this application to have land taken into trust. So there will be a lot of additional steps that the state is going to have to participate in and instigate in some cases that they would never have to do if the tribe honored the promise that it wouldn't file to have the land taken into trust. I see the logic of your argument, but it seems like ruling in your favor on that ground would lead to sort of an anomaly that the next time this kind of thing happens they just have to take it without saying what their plans are. Well, that's a possibility. To their credit, they did announce that, but just because... I mean, it seems kind of anomalous, doesn't it? I mean, we should rule in a way that just sort of encourages them to hide the ball? Well, they made a promise not to do it. And part of that promise admittedly requires that we delve into what is their intent now. And we know what that intent is, but that isn't a reason not to enforce a promise just because one side is willing to do something that they agreed not to do and we have to look at what is their intent. That's not a reason to interpret what does that Section 9 in the Compact mean. It might make it difficult to enforce, but we have those situations all the time in contracts where they may be difficult to enforce. Well, you wouldn't say that if we... I don't know how to ask this question. That this will moot the ability to challenge under Section 9 if it's actually taken into trust? It will moot it or it won't moot it? Well, there's certainly an argument that it will. What's your position as to whether it will moot it? No, our position is that it will moot it because Section 9 says they shall not apply to have land taken into trust. So if they do, then you won't be able to argue that that precludes gaming? Well, in a different forum, in a different place, we will make those arguments. But you don't think those arguments will be correct? Possibly. Well, they'll be more complicated. I understand they'll be more complicated, but I'm trying to get a view. If, in fact, you will be precluded from making those arguments because all the PAC does is prevent taking into trust, it doesn't prevent the gambling that follows taking into trust. And since it's already been taken into trust, the PAC... No, there's no longer something that can be stopped. You wouldn't make that argument? No, we would not make that argument. So you would still make the argument, whether it would be accepted or not, that once it's taken into trust, you can still rely on Section 9 to enjoin gambling? To enjoin gambling, yes. But it will be a very complicated process. I understand. And we'll have all those equitable issues that we will have to deal with once they've built the casino. I understand. But those equitable issues, again, if the law precludes it, when you're up to a final injunction, you just have to apply the law, even if it's harsh. Well, I guess I'm not sure that's true, Your Honor. The cases I looked at suggested that basically when you're entering a permanent injunction, the only difference in the test is whether there has been success on the merits as opposed to whether that success is likely, and that all the equities still have to be weighed because it's still an equitable remedy when you enjoin someone from doing something. How does it affect the state if the tribe, instead of going for Class 3 gaming, they decide that they want to do Class 2 gaming? That's an argument that they're now making, and they're making it more strongly in this appeal than they certainly had done below. We think that's a red herring primarily because we don't think there's any way that they're legitimately going to open a Class 2 casino in Lansing. Certainly, all of the announcements they've made, all the projections of revenues that they have made are based on Class 3 gaming, on slot machine revenue, which is not Class 2 gaming. Class 2 gaming is bingo. So we think that's an actual issue as to whether or not they're going to do that. We think that the trial court correctly determined based on the record before him, which was the announcement that it was going to be Class 3 gaming, that's not a realistic possibility. In fact, there is no record before the trial court of admissible evidence as to whether it's going to be Class 2 or not. But what counsel said before is that, and this argues against leaving the injunction in place, is that we should be allowed to continue because there are other means that can be used to contest these certain issues. If in the final analysis it turns out that we've constructed these casinos and we're not allowed to do this to Class 3, there are other uses. So it's not going to be like, well, because we've made this investment, everything is lost. And he makes that as an argument for why they should be allowed to submit the application and proceed rather than lose all this time because there are alternate uses that can occur if, in fact, Class 3 is not permitted when all the dust settles, if you will. I'll submit that's a factual question that was before the trial judge, and he ruled on that effectively by saying, no, I don't think there's going to be – now, he didn't actually say this, but I'm reading between the lines, but he did not buy that argument. And one reason for not buying is that there was nothing in the record before him that would support the argument that it is just an argument, that we're going to open – if we can't do Class 3 there, we're going to open a Class 2 casino. There is nothing in the record other than the statement of counsel that they might do that that would support that. And we would submit that if they were going to do that, they should have brought in more evidence. They should have brought an affidavit. They have a financier, an investor, who is going to put up all the money, $10 million. We don't believe that in the agreement with their financier that he would agree to put up $10 million so that they can open a bingo parlor in Lansing, particularly when there are casinos within easy driving distance in Mount Pleasant and in Battle Creek, practically an hour away, where there is full-fledged Class 3 gaming. It would be much too risky to open a Class 2 casino, pay $245 million to build it, is what they're saying, and operate a bingo in it. They would lose their shirt, and so would their investors. So we don't think that's a realistic possibility. We don't think that's an argument that should preclude or should certainly overturn what the trial judge has done by entering this preliminary injunction that maintains the status quo, where it was when he found the case, which was the tribe had not applied to have the land taken in trust, which is what they promised to do in their compact. Do not apply. There's a reason. It's a very unique wording for that promise, and there's a reason for it. The parties back in 1993 knew that it would be very problematic for the state or another tribe, once they had applied and gotten the land taken into trust, to then go and challenge them as the way the court is suggesting, which maybe we can do that later. And so to avoid that, it was agreed that you won't even apply to have this land taken into trust. For a purpose. For a gaming purpose, correct. If they want to apply to have it for a hospital or a daycare center or something, more power to them. But for Class 3 gaming, which is what their intention is, it's their admitted purpose and intention in front of the trial court, he understood what they were saying. I got your argument. Thank you. Okay. Thank you. Just briefly, Your Honors. On this issue of harm to the state, let's assume that the state is correct about what Section 9 prohibits, which is we believe they are not. What it entitles them to do is to bar Class 3 gaming on that property at the end of the day. But what they say is the literal terms say it bars taking into trust. And they've made the argument now that it also bars, that the mechanism it uses is to bar the trust at the beginning. But I want to be clear that the... But you would be clear that you would not argue that because it has been taken into trust that there's no longer any issue under Section 9. That's correct. You would not argue that. You would not argue that. Instead, you would say it either applies or it doesn't. And if it does, then we can't do Class 3 gaming. And if we applied for the property improperly and we don't have a revenue-sharing agreement, and if that provision applies, then we can't do Class 3 gaming. That would be our position. And when that issue is ripe, it can be adjudicated. But I guess what I'm struggling with is the ripeness issue because this doesn't say the... Once we get the land, we won't do Class 3 gaming. Your promise says, an application to take land in trust for gaming purposes shall not be submitted to the Secretary of the Interior. I'm struggling with your argument that we're doing this case too soon. If I had this language, how could... with challenging the application? Because that's the promise. If they hadn't challenged the application and came in later, wouldn't you say, you sat on your rights. I promised that I wouldn't undertake an application, and you sat on your rights while I did it. I made the application. They took it. You're too late. Well, so their contractual claim may be ripe now. What's not ripe, and I'm using that term loosely, is the abrogation of sovereign immunity. The reason they can't bring this litigation right now, among others, is that there's no abrogation of the tribe's immunity. Now, they were free to bargain in this compact. If they thought that this provision was critical and that it required specific performance and that there ought to be an immediate action in which they could get an injunction, they were free to bargain for those things under IGRA. They didn't. If you look at the dispute resolution provisions in this compact, you'll see they have nothing at all to do with this, and what they do have is a reservation of both sides' sovereign immunity. That means they're remitted to the mechanism Congress left them, which is the one we've been talking about. The second point I want to make is that the compact covers Class 3 gaming and Class 3 gaming only. We have a legal right, if we can get the land in the trust, to do either Class 2 or Class 3. Now, counsel is giving you a lot of assertions, factual assertions, with which we don't agree, but they're not issues for this court to resolve about that. But we have the legal right. He can't contest that we have the legal right to pursue Class 2 gaming if the land goes into trust, and he's conceded in his brief, the state has conceded in its brief in Note 6, that there's no basis for barring the Class 2 gaming under the compact or under IGRA, for that matter. Is there anything in your comprehensive development agreement that would indicate that there's a financial feasibility to a bingo casino? There is an express reservation in the development agreement of the right to do any kind of gaming, Class 2 or Class 3. I apologize, I don't know if this is in the record. There is an intergovernmental agreement that also addresses the possibility of the way that revenue sharing would be done under a Class 2 arrangement as well as a Class 3 arrangement. So, yes, there are things in those agreements. But that's revenue sharing. I guess I'm just getting back to the comprehensive development agreement and the expected revenues. I just think we might want to be practical here. I mean, the bottom line is if you do casino class 2 gaming at this facility, are you going to lose your shirt and are you going to lose your investment dollars if you turn to your current investor and say, we're not going to do Class 3 gaming, we're going to do bingo? With respect, that's a decision for the tribe and its development partners and the city of Lansing. All the agreements that you have in front of you or that we can provide if you like show that the parties contemplate the possibility of either Class 2 or Class 3. Class 3 is better. I am not contesting that. We want to do it if we're entitled to. But if we are legally barred from Class 3, Class 2 is a viable option. And, well, I could say a lot of things about that, but they're not in the record here. Council, I see your time is up. With respect to Count 4, is that the one that does challenge Class 3 gaming? Count 4 seeks to challenge Class 3 gaming on the ground that we will fail to establish our right under the land claim settlement exception. So the argument there wouldn't be so much sovereign immunity as ripeness because it seems to fit within the sovereign immunity category. I think that's right. The argument there is fundamentally right. So it just looks unripe. I guess it's unripe because there's, you know, many things that might go differently before the cards are dealt, right? That's correct. You might fall apart here. You might decide to do Class 2 or whatever, but there are other things. But presumably after some of these steps are taken, it's going to get closer to ripeness. That's correct. As I said, the tribe will have every incentive as a practical matter to tee this issue up for legal resolution before we get into making all the investments. When we do that, the Secretary or the NIGC will have an opportunity to pass on it. And you've conceded right here that there's been no concession or waiver or loss of any right that they might have under Section 9 by not stopping the actual taking into trust. That's correct. That's a question of now versus later. Thank you. Other questions? Thank you, Counsel. The case will be submitted.